STATE of Indiana, Appellant–Plaintiff,

v.

Gerald FOSTER, Appellee–Defendant.

No. 02A03–1010–CR–596.

Court of Appeals of Indiana.

June 10, 2011.

Transfer Denied Sept. 9, 2011.

Gregory F. Zoeller, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Gregory L. Fumarolo, Fort Wayne, IN, Attorney for Appellee.

## OPINION

GARRARD, Senior Judge.

The State appeals the trial court's grant of Defendant Gerald Foster's motion to suppress. We affirm.

On December 14, 2009, Detective Brian Martin of the Fort Wayne Police Department supervised a confidential informant's alleged controlled buy of cocaine from Foster. On the morning of January 4, 2010, twenty-one days after the controlled buy, Detective Jean Gigli and Detective Angie Reed went to Foster's apartment to arrest him at Martin's request. The detectives did not have an arrest warrant. Gigli "pound[ed]" on Foster's door, awakening

Foster and his girlfriend. Tr. p. 35. When Foster asked who was at the door, Gigli identified himself as a police officer and asserted that he was investigating a "911 hang up." Tr. p. 35. Foster and his girlfriend told the officers through the door that they were at the wrong apartment, but Gigli said that he wanted to speak to them to make sure everything was okay. The State concedes that there was no report of a 911 call, and that Gigli's statements were a ruse.

When Foster's girlfriend opened the door, Gigli and Reed came into the apartment and handcuffed Foster. Gigli watched Foster and his girlfriend while Reed searched the apartment. Next, Gigli read Foster his *Miranda* advisements and transported him to the police station. While he was in the car with Gigli, Foster made inculpatory statements. At the station, Gigli brought Foster to an interview room and again read Foster the *Miranda* advisements. Foster signed a waiver of rights form. Next, Gigli and Martin questioned Foster, who made additional inculpatory statements. After the detectives questioned Foster at the station, Martin sought and obtained a warrant for Foster's arrest.

The State charged Foster with dealing in cocaine, a Class A felony. Ind.Code § 35-48-4-1 (2006). Foster filed a motion to suppress, alleging that the warrantless arrest violated his protections against illegal search and seizure under the federal and state constitutions. After a hearing, the trial court granted Foster's motion, determining that "the officer acted in violation of the defendant's rights when he lured him into the threshold of his home." Appellant's App. p. 60. Consequently, the trial court ordered suppressed "any evidence obtained as a result of the illegal arrest of the defendant." *Id.* Subsequently, the State sought and received permis-

sion to dismiss the case without prejudice, and this appeal followed.

Our standard of appellate review of a trial court's ruling on a motion to suppress is similar to other sufficiency issues. *State v. Quirk*, 842 N.E.2d 334, 340 (Ind.2006). The record must disclose substantial evidence of probative value that supports the trial court's decision. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorably to the trial court's ruling. *Id.*

In his motion to suppress, Foster contended that his warrantless arrest violated the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution. Due to our review of Foster's claim under the Indiana Constitution, we do not address the State's Fourth Amendment argument.[1]

■ The State contends that the detectives' warrantless, in-house arrest of Foster did not violate Article I, Section 11 of the Indiana Constitution. This section is identical in text to the Fourth Amendment, but Indiana has developed a distinct approach to search and seizure. *Duran v. State*, 930 N.E.2d 10, 17 (Ind.2010). The legality of a governmental search under the Indiana Constitution turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances. *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind.2005). The reasonableness of a search or seizure turns on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred; 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and 3) the extent of law enforcement needs. *Id.* at 361. The degree of intrusion is evaluated from the citizen's point of view. *Duran*, 930 N.E.2d at 18.

■ In this case, the police had a high degree of concern that a violation had occurred. Foster challenges the propriety of his arrest, but he does not dispute that the detectives had probable cause to arrest him based on the controlled buy. Nevertheless, the degree of intrusion in this case was also high. Foster had an expectation of privacy in his apartment. *See id.* (noting that the defendant had an expectation of privacy in his home). Gigli awakened Foster and his girlfriend, summoned them to the front door, and convinced them to open the door through subterfuge. Once Foster opened the door, the detectives entered, handcuffed Foster, and searched the apartment. Finally, law enforcement needs did not require Gigli and Reed to enter Foster's apartment without a warrant. Twenty-one days had elapsed since the controlled buy, and there is no evidence that exigent circumstances called for an immediate arrest. There was ample time and opportunity for the officers to obtain an arrest warrant. In fact, the detectives obtained an arrest warrant after Foster was in custody. Balancing the three factors set forth in *Litchfield*, under the totality of the circumstances the officers' warrantless entry and in-home arrest of Foster was unreasonable and violated Article I, Section 11 of the Indiana Constitution. *See Trotter v. State*, 933 N.E.2d 572, 581 (Ind.Ct.App.2010) (determining that the officers' warrantless entry into the defendant's barn violated the Indiana Constitution where the degree of the officers' intrusion was high and there were no exigent circumstances to justify the intrusion).

1. We note that the State places considerable reliance on *Cox v. State*, 696 N.E.2d 853 (Ind. 1998). *Cox* dealt only with a Fourth Amendment claim and is inapposite here. *See id.* at 856.

■ The question then becomes whether the statements in Gigli's car and at the police station should be suppressed. Not all evidence is the fruit of the poisonous tree and subject to suppression simply because it would not have come to light but for illegal police activity. *Id.*[2] The so-called "attenuation doctrine" recognizes an exception to suppression where the connection between the illegal police conduct and discovery of the evidence "becomes so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Id.*

■ In this context then, attenuation simply means that the connection between the illegal police conduct and Foster's admissions has become so weakened in force, intensity, and effect that the taint of the illegal police conduct has been dissipated. Cases have established that three factors should be considered in determining whether the connection has become too weak: (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *See, e.g., Turner v. State,* 862 N.E.2d 695, 701 (Ind. Ct.App.2007). The important consideration in the third factor is whether the evidence came from the " 'exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Quinn v. State,* 792 N.E.2d 597, 600 (Ind.Ct.App.2003), *trans. denied* (quoting *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963)).

Here, there was very little lapsed time between the arrest and the admissions made in the police car and at the police station. Concerning the third factor, there is little doubt Foster's statements came from the exploitation of the unlawful arrest.

The State urges that the giving of *Miranda* warnings constituted a valid intervening circumstance. We cannot agree. *Miranda* warnings had been given in *Turner.* 862 N.E.2d at 698. Nevertheless, in that case the court determined, "[g]iven the near-constant interaction between Turner and the police that evening, we cannot say the connection between the illegal traffic stop and Turner's confession had been attenuated sufficiently." *Id.* at 702.

We reach the same conclusion. The connection between the arrest and the securing of statements discloses near constant interaction and exploitation of the arrest and precludes a finding of attenuation.

The trial court did not err by excluding the statements.

Affirmed.

NAJAM, J., concurs.

MAY, J., concurs in result with separate opinion.

MAY, Judge, concurring in result.

I concur, but feel it is important to distinguish the facts before us from those in *Barnes v. State,* 946 N.E.2d 572, (Ind. 2011), where our Indiana Supreme Court addressed illegal home entry by police.

Foster, like Barnes, was arrested in his home without a warrant. Unlike Barnes, Foster did not resist. Instead, after his arrest, Foster made incriminating statements in the police car and at the station. Barnes was appealing his right to resist in his own home, while Foster is challenging

2. The *Trotter* court believed that the attenuation doctrine has no application under the Indiana Constitution. 933 N.E.2d at 582. The court, however, proceeded to find the doctrine would not apply to the facts in the case before it.

the admissibility of the evidence collected after police allegedly entered his home illegally.

The *Barnes* Court "decline[d] to recognize a right to resist unlawful police entry into a home" and "decline[d] to recognize a right to batter a police officer as part of that resistance." *Barnes,* 946 N.E.2d at 576. Because there was no right to resist police entry, the *Barnes* Court said, "we need not decide the legality of the officers' entry into Barnes's apartment." *Id.* at 577.

As our Supreme Court did not address the legality of the entry and as Barnes did not argue the suppression of any evidence gleaned from the alleged illegal entry, the decision in *Barnes* does not control the case before us. Instead, *Foster* addresses the nature of the relief available when the State violates the Fourth Amendment.